**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:　　　　　　　　　　　　　)　　Case No. 22-22585-B-11
　　　　　　　　　　　　　　　　)
STOCKTON GOLF AND COUNTRY CLUB, )　　DC No. FWP-16
a California Nonprofit Mutual　 )
Benefit Corporation,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　Debtor(s).　　 )
_____)

**OPINION**

Thomas A. Willoughby, Esq., Felderstein Fitzgerald Willoughby Pascuzzi & Rios, Sacramento, California, for Debtor and Debtor in Possession.

Jamie P. Dreher, Esq., Downey Brand LLP, Sacramento, California, for Bank of Stockton.

CHRISTOPHER D. JAIME, Bankruptcy Judge:

## I.
## Introduction

　　Before the court is a *Debtor in Possession's Motion to Determine the Value of Collateral Securing Claim of Bank of Stockton and the Extent of Bank of Stockton's Secured Claim Pursuant to 11 U.S.C. § 506(A) [sic] and Fed. R. Bankr. P. 3012* filed by debtor and debtor in possession Stockton Golf and County Club, a California Nonprofit Mutual Benefit Corporation ("SGCC"). The motion is opposed by SGCC's primary lender, the Bank of Stockton ("BoS").

　　SGCC operates the property subject to valuation as a private golf course, country club, and event center in Stockton, California. The property has been operating as a golf course

since 1914. It includes an 18-hole course with amenities and improvements, clubhouse, pro shop, maintenance compound, fitness center, pool, cart storage, and practice facilities consisting of putting and chipping greens.[1]

The Golf Club has been described as a gem of the San Joaquin Valley. It is a pillar of the Stockton community. It has survived two world wars, two pandemics, and numerous economic downturns. Faced with declining membership and significant financial pressure from BoS, on October 11, 2022, SGCC was forced to file for protection under Chapter 11 of the Bankruptcy Code.

BoS is prepared to use all means necessary to satisfy its secured claim with the Golf Club. This apparently includes terminating operation of the Golf Club by acquiring and selling the property without any golf-related commitments or use restrictions, or attempting to compel SGCC to do the same.[2] This was made abundantly clear during a recent evidentiary hearing held before this court to determine the Golf Club's value which, in turn, will determine the extent of BoS's secured claim in SGCC's Chapter 11 case.

This Opinion constitutes the court's findings of fact and conclusions of law.[3] Fed. R. Civ. P. 52(a); Fed. R. Bankr. P.

---

[1] The real property, its amenities, and all related personal property will be referred to in this Opinion as the "Golf Club."

[2] BoS's apparent hostility towards the continued operation of the Golf Club as a private club appears to be based, in part, on a vehement objection to golf-related use restrictions which SGCC has insisted on as a condition of sale.

[3] The court has reviewed and takes judicial notice of the claims register and the docket, including all documents related

- 2 -

7052, 9014(c). This Opinion also follows rather than sets precedent. However, the court publishes its decision for three reasons: first, to emphasize that a bankruptcy court may reject an appraisal submitted in a valuation proceeding under 11 U.S.C. § 506(a); second, to explain why the appraisal that BoS submitted with its opposition will be rejected in its entirety and not given any evidentiary weight; and third, bankruptcy proceedings of a regional institution of historical significance are a matter of substantial public interest.

## II.
## Background

BoS has a senior priority lien on the Golf Club. According to its proof of claim filed on February 14, 2023, Claim 25-1, BoS asserts it is owed $8,209,972.15 as of SGCC's Chapter 11 petition date. Although no formal objection to the BoS proof of claim has been filed, SGCC has stated in prior proceedings before the court that it disputes the amount claimed.

SGCC asserts that the Golf Club is worth slightly over $4,000,000. BoS asserts it is worth nearly $8,000,000. In addition to reviewing volumes of trial exhibits, on May 3, 2023, the court heard a full day of testimony from several witnesses to resolve this dispute. Specifically, the court heard testimony from three appraisers: (1) Z. Gordon Davidson, President of Z. Gordon Davidson & Associates, Inc. ("Mr. Davidson"); (2) Laurence

---

to the present motion. See Fed. R. Evid. 201(c)(1). The court's evidentiary rulings stated on the record on May 3-4, 2023, are also incorporated into and made a part of this Opinion.

- 3 -

A. Hirsh, President of Golf Property Analysts, a division of Hirsh Valuation Group, Inc. ("Mr. Hirsh"); and (3) Jason S. Jackson, Senior Managing Director of the Fort Worth, Texas, office of Integra Realty Resources, Inc. ("Mr. Jackson").

Mr. Davidson testified on behalf of SGCC. Mr. Davidson prepared an appraisal which SGCC submitted with its motion ("Davidson Appraisal"). The Davidson Appraisal is dated March 14, 2023. It values the Golf Club under income capitalization and comparable sales approaches with greater emphasis on and weight given to the former. It concludes that as of January 31, 2023, the market value of the as-is fee simple interest in the Golf Club is $4,150,000 under an income capitalization approach.

Mr. Jackson testified on behalf of BoS. Mr. Jackson also prepared an appraisal which BoS submitted with its opposition ("Jackson Appraisal"). The Jackson Appraisal is dated January 18, 2023. It values the Golf Club under income capitalization and comparable sales approaches with greater emphasis on and weight given to the former. It concludes that as of December 14, 2022, the market value of the as-is fee simple interest in the Golf Club is $7,800,000 under an income capitalization approach.

Mr. Hirsh testified on behalf of SGCC. He performed a formal review of the Jackson Appraisal according to USPAP (Uniform Standards of Professional Appraisal Practice) Standards. The Davidson Appraisal was not independently reviewed under the same standards by any other appraiser.

All three individuals have extensive education, training, and professional qualifications, generally, and, particularly, within the golf industry. All three are also qualified as

experts and their testimony is admitted as such for purposes of the motion to value.

In addition to the three expert witnesses, Rick Schultz ("Mr. Schultz") testified as a lay witness on behalf of SGCC. Mr. Shultz is a Certified Club Manager with the Club Managers Association of America. He is among 2% of private club managers who hold a PGA Class A certification status. He has substantial knowledge of golf course operations, management, budgeting, and membership based on his employment as the Golf Club's General Manager and similar employment at other golf clubs prior to employment with SGCC.

### III.
### Jurisdiction and Venue

Federal subject matter jurisdiction is founded on 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (L), and (O). The bankruptcy court may enter a final order. 28 U.S.C. § 157(b)(1). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### IV.
### Analysis

A. <u>The Section 506(a)(1) Valuation Standard</u>

In relevant part, Bankruptcy Code § 506(a)(1) states that the value of a secured creditor's interest in the estate's interest in property "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property[.]" 11 U.S.C. § 506(a)(1); <u>Associates Commercial Corp. v. Rash</u>, 520 U.S. 953, 962-63 (1997). The proposed use of the

1  Golf Club here is its continued operation as a private golf club
2  under a plan of reorganization.  Docket 231 at 1:18-22.
3  　　　The value of the property to be retained by a debtor in the
4  context of a cram-down plan "is the cost the debtor would incur
5  to obtain a like asset for the same 'proposed . . . use.'"  Rash,
6  520 U.S. at 965.  This valuation standard is commonly referred to
7  as "replacement value," though it "is consistent with the Ninth
8  Circuit's understanding of the meaning of fair-market value."
9  Id. at 959 n.2.  Replacement value "is the price a willing buyer
10 in the debtor's trade, business, or situation would pay to obtain
11 like property from a willing seller."  Id. at 960; First Southern
12 National Bank v. Sunnyslope Housing Ltd. Partnership (In re
13 Sunnyslope), 859 F.3d 637, 644 (9th Cir. 2017), *cert. denied*, 138
14 S.Ct. 648 (2018) .
15 　　　The parties agree that the above-referenced standard is the
16 applicable standard to be applied here under § 506(a)(1).
17 Dockets 305 at 5:16-7:24, 326 at 4:24-5:1.  The parties also
18 agree the above-referenced standard should be applied to the Golf
19 Club without regard to SGCC's status or organization as a non-
20 profit entity.  Dockets 305 at 7:12-18, 326 at 6:17-23.  The
21 court agrees with both points.
22 　　　B.　Specific Valuation Method Under the § 506(a)(1)
　　　　　　Standard
23
24 　　　The appraisers agree that the "highest and best" use of the
25 Golf Club for valuation purposes is its current use as a private
26 golf course and country club with amenities and that there is no
27 alternative use that could reasonably be expected to provide a
28 higher present value than the current use.  Davidson ADT at ¶ 39;

Jackson ADT at ¶ 74. The appraisers also agree that for purposes of valuing the Golf Club, the income capitalization approach should be given the most weight because it is the most reliable valuation method for this property. Davidson ADT at ¶ 46; Jackson ADT at ¶ 118.

The parties agree with both above-referenced points. Docket 326 at 4:1-15. The court does as well. The court's analysis and discussion below are therefore limited, and should be read only to refer to valuation of the Golf Club under the income capitalization approach that Messrs. Davidson and Jackson used in their respective appraisals. In other words, when discussing the Davidson and Jackson appraisals and their value conclusions, the court does not rely on the sales comparison approach in either (or both) appraisals.[4]

### C. Valuation Standards Relevant to Appraisals

Nearly forty years ago, the Ninth Circuit stated that "[t]rial courts have particularly broad discretion with respect to questions of valuations." Ebben v. C.I.R., 783 F.2d 906, 909 (9th Cir. 1986). In describing the breadth of this discretion,

---

[4] Mr. Davidson acknowledged that for some unknown reason there were errors on his comparable sales spreadsheet. He owned up to the errors and, importantly, testified they did not affect his analysis or value conclusion under the income capitalization approach. Mr. Davidson also explained, and Mr. Jackson acknowledged, that the local rather than the national golf market is more relevant for comparables in this case because California golf courses are unique, at the very least, due to favorable weather conditions. Trial Ex. 1 at 96 (TE00096). Support for this latter point is found in the fact that Mr. Jackson changed his testimony from a national to a local focus with regard to a potential buyer of the Golf Club. Docket 343 at 10:23-25. The point here is that the income capitalization approach is the more reliable valuation method.

the Ninth Circuit in <u>Ebben</u> explained: "A trial judge's decisions on qualitative matters of this type are so rarely overturned on appeal that they are, for practical purposes, conclusive." <u>Id.</u> at n.1 (citation and internal quotation omitted).

The breadth of its discretion gives the bankruptcy court ample authority to reject an appraisal in its entirety. <u>Nubia v. Real Time Resolutions, Inc. (In re Nubia)</u>, 2021 WL 1561544, *2 (9th Cir. BAP April 21, 2021) ("More importantly, the bankruptcy court is not bound to accept valuation opinions or appraisals and may form its own opinion of value based on the evidence presented."); <u>see also</u> <u>In re Evans</u>, 492 B.R. 480, 508 (Bankr. S.D. Miss. 2013) ("A court may accept an appraisal in its entirety, may choose to give weight only to portions of the appraisal, or may reject the appraisal altogether."); <u>In re Ahmed</u>, 2011 WL 1004649, *2 (Bankr. N.D. Cal. March 15, 2011) ("The court does not necessarily abuse its discretion if it decides to reject an appraisal.").

An appraisal may be rejected in its entirety when its value conclusion is based on assumptions fundamental to the conclusion that have no anchors in reality. <u>In re Diamond Beach VP, LP</u>, 506 B.R. 701, 717 (Bankr. S.D. Tex. 2014), *aff'd*, 551 B.R. 590 (S.D. Tex. 2016). For example, in <u>Washington Mutual, Inc. v. U.S.</u>, 856 F.3d 711 (9th Cir. 2017), a case involving asset valuation in the context of a tax refund dispute, the Ninth Circuit affirmed the district court's rejection of the Appellant's expert's income approach valuation analysis and value conclusion in their entirety resulting in the Appellant's inability to meet its burden of establishing asset value. <u>Id.</u> at 723. In reaching its

decision, the Ninth Circuit noted that the expert's valuation analysis and value conclusion were based on assumptions that contravened the economic realities at the time and conflicted with actual economic projections. Id. It also described the expert's assumptions as "overly optimistic" and "unrealistic." Id. at 724. In the end, the Ninth Circuit held that the district court was justified in rejecting Appellant's valuation evidence in its entirety because cumulative errors rendered the valuation analysis and value conclusion too flawed to be reliable. Id. at 725; see also Sammons v. C.I.R., 838 F.2d 330, 334 (9th Cir. 1988) (affirming rejection of appraisal based on assumptions contrary to actual circumstances established by testimony).

D. Burden of Proof in the § 506(a)(1) Valuation Process

The parties agree that, as the moving party, SGCC has the initial burden of producing credible evidence of value, and BoS, as the opposing party, has the burden of defeating SGCC's credible evidence by a preponderance of the evidence. Dockets 305 at 4:10-19, 326 at 4:17-23.

SGCC has satisfied its initial burden with the Davidson Appraisal which values the Golf Club at $4,150,000. Relatedly, Mr. Davidson's testimony is much more consistent, and therefore much more credible, than Mr. Jackson's testimony. Mr. Davidson's testimony is therefore given substantially more weight.[5]

Rejection of the Jackson Appraisal means that BoS has not satisfied its burden. As explained in detail below, the court

---

[5] After observing Mr. Davidson testify and carefully listening to his testimony, no consideration is given to BoS's attempt to ethically discredit Mr. Davidson and his appraisal.

rejects the Jackson Appraisal as inherently unreliable with a value conclusion that is not credible, which means it effectively has no evidentiary weight, because: (i) its fundamental underlying premise and value conclusion are not anchored in-and in fact contravene-reality; (ii) it is internally inconsistent and it conflicts with Mr. Jackson's testimony; and (iii) it relies on an unrealistic projected course maintenance expense.

        1.   <u>The Underlying Premise of the Jackson Appraisal and its Value Conclusion are not Based in Reality</u>.

The Jackson Appraisal states that there are "[s]ignificant items of deferred maintenance[.]" Trial Ex. 2 at 47 (TE00221). It quantifies the deferred maintenance at $1,000,000. <u>Id.</u> at 48 (TE 00222). Of that amount, $600,000 is course maintenance. <u>Id.</u>

The Jackson Appraisal is based on an underlying premise that the existing deferred maintenance has been completed and its completion *increases* and *stabilizes* membership at 430 members. More precisely, the Jackson Appraisal states as follows:

> As previously mentioned, the decline in membership could be attributed to the items of deferred maintenance, which has led to a decrease in the quality of the club. Once deferred maintenance is cured, we anticipate that membership will be able to suitably rebound to 430 members which is reasonable based on membership numbers dating back to 2018.
>
> Membership at the club has ranged from 404 to 462 members over the last five years. We have utilized a stabilized figure of 430 members which is in the middle of the range. Due to the amount of the previously discussed deferred maintenance, it is likely membership levels have decreased as a direct result. We have appraised as though the identified deferred maintenance has been effectively cured (we deducted from the reconciled value); as such, it is reasonable that some of the lost membership will be recaptured do [sic] to improved course/clubhouse conditions.

Trial Ex. 2 at 62 (TE00236).

The problem with the underlying premise of the Jackson Appraisal is that it contravenes economic reality. In other words, it ignores the actual economic consequence to a golf club that flow directly from completed deferred maintenance.

Messrs. Hirsh and Schultz testified that deferred maintenance is ultimately paid by member assessments. Hirsh Audio at 1:16:14; Schultz ADT at ¶ 19. Mr. Schultz further testified that assessing members actually decreases membership because it causes members to leave. Mr. Schultz's exact testimony on this point is as follows:

> For example, at Oakdale, when I was hired, it did not have enough funds to make payroll, and we had to immediately make an emergency assessment on members, and there was extensive deferred maintenance, which is how clubs handle a shortfall in funds, which then leads directly to lost membership, and further contractions in revenues.

Schultz ADT at ¶ 19.[6]

The salient point here is that the completion of deferred maintenance, as the Jackson Appraisal presumes for purposes of its value conclusion, actually *decreases*-and thence *destabilizes*- golf club membership. In that regard, the fundamental premise on which the Jackson Appraisal bases its valuation analysis to arrive at a value conclusion, *i.e.*, that completed deferred maintenance increases and stabilizes membership, contravenes economic realities making the underlying premise of the Jackson

---

[6]Mr. Schultz's testimony on this point is unchallenged. And given his substantial first-hand experience with golf courses, generally, and his significant experience and knowledge of golf course operations and memberships as a General Manager, in particular, Mr. Schultz's testimony on this particular point is exceptionally credible and the court gives it substantial weight.

Appraisal overly optimistic and unrealistic. That renders the entirety of the Jackson Appraisal inherently unreliable and its value conclusion not credible. And in addition to the other flaws discussed below, that warrants rejection of the Jackson Appraisal in its entirety.

    2. <u>The Jackson Appraisal is Internally Inconsistent and it Conflicts with Mr. Jackson's Testimony.</u>

The Jackson Appraisal states that "[t]he value conclusion(s) in this report consider the impact of COVID-19 on the subject property." Trial Ex. 2 at 8 (TE00173). This statement conflicts with Mr. Jackson's testimony about the appraisal and, at best, it appears to be inaccurate.

Mr. Schultz testified that in fiscal years 2021 and 2022 SGCC received nonrecurring Covid-relief revenue. In 2021 SGCC received a $430,000 Paycheck Protection Program ("PPP") loan that was ultimately forgiven and in 2021 and 2022 it received $750,000 in Employee Retention Credits ("ERC"). Schultz Audio at 21:53-22:27, 23:08-23:45, 38:00-38:30. When Mr. Jackson was asked about this nonrecurring Covid-relief revenue and how it factored into his appraisal, he testified that he made no adjustments for the 2021 PPE loan or the 2021-2022 ERC because he assumed that all of SGCC's revenue came from golf operations, he was unfamiliar with the term "ERC credits," and he generally appeared to be unaware that SGCC received the PPP loan and the ERC. Jackson Audio at 46:05-47:48.[7]

---

[7] BoS suggested that the 2021 fiscal year revenue figure of $3,949,731 cited in the Jackson Appraisal accounts for the nonrecurring 2021 PPP loan and the 2021-2022 ERC. Schultz Audio at 22:27-24:58. That appears to not be the case. The Jackson

1    In light of Mr. Jackson's testimony, the court is hard-
2 pressed to comprehend how the statement in the Jackson Appraisal
3 that its value conclusion considers the impact of Covid-19 is
4 accurate- or even true.  This conflict weighs negatively on Mr.
5 Jackson's credibility.  And for this additional reason, it also
6 strips the Jackson Appraisal of all weight and renders it subject
7 to rejection as inherently unreliable with a value conclusion
8 that is not credible.

### 3. The Jackson Appraisal Projects an Unrealistic Course Maintenance Expense.

The Jackson appraisal projects an unrealistic course maintenance expense of $800,000.  Jackson ADT at ¶ 90; Trial Ex. 2 at 64, 72 (TE00238, TE00242).  As an initial matter, the court notes that the $800,000 projected course maintenance expense is

---

Appraisal does "note that the $3,949,731 revenue amount for 2021 is considered an outlier due to the impact of COVID-19."  Trial Ex. 2 at 59 (TE00233).  However, Mr. Jackson attributed the lower revenue figure in fiscal year 2021 to a reduction in food sales and not the PPE or the ERC.  He testified as follows:

> After analyzing past performance, I determined that the subject property's 2021 revenue of $3,949,731, the lowest in recent history, should be considered an outlier.  The Club's fiscal year 2021 ranged from October 1, 2020 through September 30, 2021, and appears to have been significantly impacted by a reduction in food and beverage revenue, likely related to COVID-19.

Jackson ADT at ¶ 84.

Moreover, that Mr. Jackson was generally unaware SGCC received nonrecurring Covid-relief revenue in 2021 and 2022, and therefore made no adjustments for it, may also stem from the fact that he may have reviewed-and thence relied on-financial statements different from financial statements in the possession of SGCC's CPA.  Schultz Audio at 24:40-24:50.  That adds an additional layer of reliability and credibility concern.

- 13 -

1  $123,818 less than the $923,818 average the Jackson Appraisal
2  calculates SGCC spent over the past five years.  Trial Ex. 2 at
3  64 (TE00238).  It is also less than the amount SGCC spent on
4  course maintenance over twenty years ago.  Jackson Audio at
5  29:24-29:50.  In 2002 SGCC spent $805,302 on course maintenance
6  and in 2003 it spent $808,741 on course maintenance.  Trial Ex. 3
7  at TE00473, TE00486; Jackson Audio at 28:07-29:04.

8  Perhaps one explanation for the $800,000 projection is that
9  the need for course maintenance is reduced after deferred
10 maintenance is completed.  Jackson ADT ¶ 90.  But that
11 explanation is not credible because it conflicts with Mr.
12 Jackson's testimony on this point.

13 Mr. Jackson testified that he is familiar with the concept
14 of inflation.  Jackson Audio at 25:05-25:55, 29:50-30:00, 33:03-
15 33:18.  Indeed, he testified that inflation is a "standard
16 assumption."  Jackson ADT at ¶ 20.  And against this backdrop,
17 Mr. Jackson also testified, quite emphatically, that "costs
18 always go up."  Jackson Audio at 25:34-36.  So when viewed in
19 this context, the projection in the Jackson Appraisal that SGCC
20 will spend less on course maintenance than its five-year average
21 and less than what it spent twenty years ago is not realistic.
22 And it is not credible.[8]

23 Typically, a single expense item such as this might warrant
24 an adjustment.  Here, however, the unrealistic course maintenance

---

[8]The $800,000 projection also defies logic.  If SGCC spent an average of $923,818 on course maintenance over the past five years and $600,000 in deferred course maintenance remained and is presumed to have been completed, the court can infer that even the $923,818 was insufficient to maintain the course.

projection adds to the cumulative effect and, in the words of Washington Mutual, it reinforces that the Jackson Appraisal is too flawed to be reliable or credible.

**V.**
**Conclusion**

At the end of the day, the court's analysis boils down to the burden of proof. SGCC has satisfied its burden. Rejection of the Jackson Appraisal in its entirety means that BoS has not satisfied its burden. That leaves the Davidson Appraisal as the only reliable, credible, probative, and persuasive evidence of the Golf Club's value.

The court accepts the Davidson Appraisal and adopts its value conclusion under the income capitalization approach as the value of the Golf Club. Accordingly, the court values the Golf Club at $4,150,000 under 11 U.S.C. § 506(a)(1).

SGCC's motion to value is GRANTED.

A separate order will issue.

**Dated:** May 15, 2023

**Christopher D. Jaime, Judge**
**United States Bankruptcy Court**

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Thomas A. Willoughby
500 Capitol Mall, Suite 2250
Sacramento CA 95814

Jamie P. Dreher
621 Capitol Mall, 18th Floor
Sacramento CA 95814